UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GINA M. RAMAZETTI,

    Plaintiff,

v.                                          Case No. 8:19-cv-260-T-MAP

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.
_____/

## **ORDER**

This is an appeal of the administrative denial of supplemental security income (SSI) and disability insurance benefits (DIB).[1] *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Plaintiff argues her case should be remanded to the Commissioner under sentence four of 42 U.S.C. §405(g), because the Administrative Law Judge (ALJ) erred in considering the opinions of her treating psychiatrist and treating physician and erred in finding her bipolar disorder does not meet the requirements of medical listing 12.04. Plaintiff also contends the ALJ was not constitutionally appointed. After considering Plaintiff's arguments, Defendant's response, and the administrative record (docs. 16, 24), I find substantial evidence supports the ALJ's decision that Plaintiff is not disabled. I affirm.

    A.  *Background*

Plaintiff Gina Ramazetti was born on April 26, 1971, and was 42 years old on her alleged onset date of April 25, 2014. She graduated from high school and attended two years of college. She has past work experience as a Publix cashier, a Bealls sales associate, a Walgreens photo department representative, and a Target cashier. Plaintiff alleges disability due to anxiety disorder,

---

[1] The parties have consented to my jurisdiction under 28 U.S.C. § 636(c).

depression, bipolar disorder, ADHD, and degenerative disc disease following a car accident and a traumatic brain injury in 1990.

Plaintiff testified she is unable to work because "[w]henever I get a job, sometimes I flip out and I'll have like one of my moments and I get fired. I don't know, like if somebody is telling me how to like run the register, I know how to run the register and they don't know when it's going to happen, when I have these episodes." (R. 49) And "I might be having a good day, everything's fine, and then I'll just have a flip-out and I'll just walk away from my register and – because I don't want to like get in trouble, but I get in trouble anyways for leaving my register." (*Id.*) She explained on her pain questionnaire, "I like to work but it is very difficult for me to get along with others and have higher authority above me." (R. 295) Contact with people "triggers her mental illness," and "resting and getting away from public" are the only things that provide relief. (R. 276) Regarding her back pain, nothing relieves it. (*Id.*)

Plaintiff lives with her 70-year-old mom, who takes care of her and pays her expenses. (R. 60) Plaintiff cooks and cleans, takes care of her cat, drives herself to the grocery store to shop, and attends church on Sundays (although the pews hurt her back). (R. 53, 58-59) She testified she is completely dependent on her mom: "[W]hen she dies I'm scared what's going to happen to me. Am I going to end up in a homeless shelter? I mean, so – what's going to happen and that's the only thing that I worry about and I'm so scared, you know, and she does have some heart issues and I worry about that." (R. 60-61)

After the hearing, the ALJ found Plaintiff has the severe impairments of degenerative disc disease; anxiety related disorder; and affective mood disorder (R. 14) The ALJ identified Plaintiff's non-severe impairments as chronic rhinitis and mild carpal tunnel syndrome. (*Id.*)

Aided by the testimony of a VE, the ALJ determined Plaintiff is not disabled as she has the RFC to perform light work with the following limitations:

> She can lift and/or carry 20 pounds occasionally and lift and/or carry 10 pounds frequently; she can stand and/or walk 6 hours in an 8-hour workday and sit 6 hours in an 8-hour workday; she can occasionally climb ramps/stairs, ladders/ropes/scaffold, and crawl; and she can frequently stoop. The Claimant is able to understand, carry out, and remember simple, routine, and repetitive tasks; involving only simple, work-related decisions with the ability to adapt to routine work place changes. She may have frequent interactions with supervisors and coworkers, but only occasional interaction with the general public.

(R. 17) The ALJ found that, with this RFC, Plaintiff is unable to perform her past relevant work but could work as a hotel housekeeper, mail clerk, or garment sorter. (R. 21) The Appeals Council denied review. Plaintiff, having exhausted her administrative remedies, filed this action.

   *B. Standard of Review*

To be entitled to DIB and/or SSI, a claimant must be unable to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *See* 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Social Security Administration, to regularize the adjudicative process, promulgated detailed regulations that are currently in effect. These regulations establish a "sequential evaluation process" to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Under this process, the Commissioner must determine, in sequence, the following: (1) whether the claimant is currently engaged in

3

substantial gainful activity; (2) whether the claimant has a severe impairment(s) (*i.e.*, one that significantly limits her ability to perform work-related functions); (3) whether the severe impairment meets or equals the medical criteria of Appendix 1, 20 C.F.R. Part 404, Subpart P; (4) considering the Commissioner's determination of claimant's RFC, whether the claimant can perform her past relevant work; and (5) if the claimant cannot perform the tasks required of her prior work, the ALJ must decide if the claimant can do other work in the national economy in view of her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant is entitled to benefits only if unable to perform other work. *See Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); 20 C.F.R. § 404.1520(f), (g); 20 C.F.R. § 416.920(f), (g).

In reviewing the ALJ's findings, this Court must ask if substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The ALJ's factual findings are conclusive if "substantial evidence consisting of relevant evidence as a reasonable person would accept as adequate to support a conclusion exists." *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citation and quotations omitted). The Court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds the evidence preponderates against the ALJ's decision. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Keeton*, 21 F.3d at 1066 (citations omitted).

*C. Discussion*

*1. Dr. Yale*

Plaintiff argues that the ALJ erred by discounting the opinions of her long-time treating psychiatrist Steven Yale, M.D., who authored two mental capacity assessments (in February 2016,

and October 2017), finding Plaintiff more limited than the ALJ's RFC reflects. The Commissioner counters that Dr. Yale's RFC assessments are inconsistent with his treatment notes. I agree with the Commissioner.

The method for weighing medical opinions under the Social Security Act is set forth in the regulations at 20 C.F.R. § 404.1527(c). Relevant here, the opinions of examining physicians are generally given more weight than non-examining physicians, treating more than non-treating physicians, and specialists more than non-specialist physicians. 20 C.F.R. § 404.1527(c)(1-5). A court must give a treating physician's opinions substantial or considerable weight unless "good cause" is shown to the contrary. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause for disregarding such opinions "exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (citation omitted).

This rule – the "treating physician rule" – reflects the regulations, which recognize that treating physicians "are likely to be the medical professionals most likely to provide a detailed, longitudinal picture of . . . medical impairment." 20 C.F.R. § 404.1527(d)(2). *Winschel* instructs that with good cause, an ALJ may disregard a treating physician's opinion but "must clearly articulate the reasons for doing so." 631 F.3d at 1179 (*quoting Phillips v. Barnhart*, 357 at 1240 n.8). Additionally, the ALJ must state the weight given to different medical opinions and why. *Id*. Otherwise, "it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).

Here, the ALJ assigned "some weight to the opinion of treating source Dr. Steven R. Yale, M.D." (R. 18)  After summarizing Dr. Yale's two mental RFC assessments, the ALJ determined "the suggestions by Dr. Yale [were] inconsistent with his own treatment history of the claimant. Treatment notes from February of 2015 through September of 2017 generally indicated stable progress; appointments were at least 2 months apart; and mental status notes were for the most part unremarkable with the exception of abnormal mood/affect." (*Id*.)  He continued, "the claimant was routinely described as alert, oriented to person, place, time, and situation, good eye contact, normal speech, good appearance, normal motor, fair sleep, normal attention, normal thought process, and good insight/judgment." (*Id*.)  The ALJ also correctly pointed out Dr. Yale's opinion that Plaintiff cannot work is a legal determination reserved for the Commissioner. (*Id*.; *see* 20 C.F.R. §§ 404.1546(c); 416.946(c)).

Dr. Yale began treating Plaintiff in 2008 for bipolar disorder and ADHD, although in the administrative record the psychiatrist's earliest treatment note is dated February 26, 2015 (his prior treatment notes were included in Plaintiff's first benefits application, which she lost on appeal to the district court).  On that date, Plaintiff reported doing well and sleeping through the night. (R. 490)  She said she was isolating herself at home but had her outbursts under control. (*Id*.)  Dr. Yale noted she had a normal attention span; a clear, coherent, and logical thought process; good judgment; and an appropriate affect.  He characterized her as stable and continued to prescribe her Prozac and Abilify but replaced Adderall with Ritalin. (*Id*.)  Plaintiff was directed to follow up with Dr. Yale in one month (or sooner if the Ritalin did not work). (*Id*.)

Plaintiff returned to Dr. Yale on March 18, 2015.  She had relapsed on Ritalin and was feeling more anxious and impulsive. (R. 489)  Dr. Yale switched Plaintiff back to Adderall. Plaintiff's mood was "anxious," but Dr. Yale also noted her attention was normal; her thought

6

process clear; her judgment good. (*Id.*) She returned to Dr. Yale two months later (May 28, 2015), again in the throes of a relapse. Her mood was depressed, and she was anxious. (R. 488) This time, she had run out of Prozac and was worried about a jury summons she had received. Dr. Yale refilled her medications (including Prozac) and wrote a short letter recommending Plaintiff be excused from jury duty, explaining: "[Plaintiff] has been under my care for a serious psychiatric condition for many years. I believe that jury duty may destabilize her condition and result in her hospitalization." (R. 437) Still, Dr. Yale noted Plaintiff had normal attention, good judgment, and clear thoughts, and asked her to return in three months. (R. 488)

Three months later in August 2015, Plaintiff's condition had stabilized since complying with her medication. (R. 421, 487) Although she was agitated because a $106 debt had been sent to a collection agency, she reported getting along with her family. At a follow-up appointment in November 2015, her mood was stable, she was sleeping seven hours a night, and Dr. Yale's findings (including attention, insight, judgment, and thought processes) were normal. Dr. Yale commented that Plaintiff "has decompensated in the past and was advised to continue to maintain boundaries with others." (R. 486)

Against this treatment backdrop, Dr. Yale completed his first mental capacity assessment for Plaintiff on February 23, 2016. (R. 431-33) He wrote that Plaintiff "suffers from Bipolar I disorder[,] [Plaintiff] has been fired from numerous jobs for emotional instability, mood swings." (R. 433) He assessed Plaintiff with marked limitations in nine areas of functioning, including ability to interact appropriately with the public and coworkers; ability to accept criticism from supervisors; ability to work a normal workday and workweek without interruption from psychological symptoms; ability to understand and remember instructions; and ability to concentrate. (R. 431-33) Dr. Yale supplemented this assessment with a short letter, writing "[d]ue

7

to the severity of her mental illness and her history of sudden outbursts, [Plaintiff] has been unable to hold a job since 2010 and is in the process of filing for disability. In my opinion, [Plaintiff] is unable to work at this time due to her risk of decompensation." (R. 434)

Around this time, Daniel Johnson, M.D. completed a consultative evaluation of Plaintiff at the agency's request. (R. 426-30) He relayed Plaintiff's complaint that she "has a lot of trouble in dealing with supervisors and customers. She has been fired from many jobs because of this." (R. 430) Adderall "helps her stay focused." (*Id.*) Regarding Plaintiff's physical impairments, Dr. Johnson reported Plaintiff has full use of her upper body, good grip strength, and intact fine motor skills; needs to frequently change positions due to her chronic low back pain; and can lift 10 pounds occasionally. (*Id.*)

Interestingly, at Plaintiff's 2016 and 2017 appointments with Dr. Yale (she returned every three months or so), the psychiatrist classified Plaintiff's condition as stable or improved most of the time and noted her appropriate affect, attention, thought processes, judgment, and insight. (R. 485, 484, 482, 480) Plaintiff continued to report racing thoughts but had fewer mood swings, fewer manic episodes, and increased sleep. (R. 482-83) She had one more relapse in September 2017, when she told Dr. Yale about recent irritable outbursts and racing thoughts. Yet even then Dr. Yale reported Plaintiff had normal judgment and insight; was oriented to person, place, and time; and had normal attention. (R. 481)

The next month (October 2017), Dr. Yale completed another mental capacity assessment (his second). (R. 461-63) This time, Plaintiff had only moderate limitations in her ability to understand and remember instructions and maintain sustained concentration and persistence in most categories. (R. 461) Her ability to interact socially, however, was still marred by marked limitations. (R. 462) Dr. Yale wrote: "[Plaintiff] suffers from Bipolar I disorder. She has had

8

numerous violent outbursts and has threatened to harm coworkers or herself when placed in a structured work setting." (R. 463)

Against this medical backdrop, substantial evidence supports the ALJ's decision to assign only some weight to Dr. Yale's RFC assessments. As detailed here, Dr. Yale consistently noted during Plaintiff's appointments that her progress was stable and her mental status generally normal. Her relapses were attributable to a medication change (from Adderall to Ritalin in March 2015) (R. 489), and her medication running out (Prozac in May 2015). (R. 488) On these occasions, Dr. Yale continued to assess Plaintiff's functioning in key areas as normal. Additionally, Plaintiff's appointments were two or three months apart and her treatment consisted of medication management, belying Dr. Yale's conclusion that Plaintiff mental functioning is so limited she cannot work. Contrary to Plaintiff's argument, consultative examiner Dr. Johnson's observation that Plaintiff "has trouble" dealing with supervisors and customers is not determinative of disability.

At this point, Plaintiff argues the ALJ relied too heavily on treatment notes from appointments when she was stable. Bipolar disorder, Plaintiff points out, is episodic and characterized by mood swings between mania and depression. True, but the ALJ summarized all of Plaintiff's psychiatric treatment, including Dr. Yale's reports of relapses. Adderall helps her focus; when she is compliant with all her medications, she usually reports feeling stable and in control. What is more, despite Plaintiff's report on her pain questionnaire that her daily activities are limited to "get up, make bed, eat breakfast and watch TV then go to bed," (R. 289) she also mentioned she regularly does laundry, dishes, housework, and cooking; she drives herself to and from the grocery store and gas station; she takes care of her cat; and she attends church every week

when she can. (R. 292) She gardens and spends time with family and friends. Considering this, the ALJ's decision to discount Dr. Yale's opinions is supported by substantial evidence.

### 2. *Dr. Nomula*

Plaintiff's second argument is that the ALJ erred in discounting the opinions of Plaintiff's treating primary care physician, Suvarna Nomula, M.D., who treated Plaintiff from early 2013, until September 2017, and whose physical RFC assessment the ALJ afforded "some weight." (R. 18) The Commissioner counters that Dr. Nomula's treatment notes conflict with the more extreme limitations of her RFC assessment. I side with the Commissioner; substantial evidence supports the ALJ's decision to assign some – rather than controlling – weight to Dr. Nomula's opinions.

Dr. Nomula competed a two-page, check-the-box physical assessment of Plaintiff in December 2015. (R. 423-24) She opined Plaintiff suffered from disc disease of her cervical spine. As a result of this impairment, Plaintiff could sit for two hours during a workday; stand for two hours; would need 10-minute unscheduled breaks every two hours; and would miss work three to four times every month. (R. 423-24) Interestingly, Dr. Nomula also opined Plaintiff can frequently lift and carry 10 pounds and can occasionally lift and carry 20 pounds; is not limited in reaching, handling, or fingering; and her disc disease would seldom interfere with her ability to pay attention and concentrate. (R. 423) All told, Dr. Nomula assessed Plaintiff's RFC at the less than light level.

The ALJ gave Dr. Nomula's records "some weight." (R. 18) The ALJ found that the physician's "limitations of sit, stand, and/or walk in addition to the excessive absenteeism was inconsistent with Dr. Nomula's own treatment history." (*Id.*) The ALJ emphasized that, "[t]reatment notes prior to her opinion indicated assessments of skin issues, chronic rhinitis, and acute respiratory infection. Furthermore, physical examination notes were unremarkable." (*Id.*)

Substantial evidence supports the ALJ's decision to assign Dr. Nomula's opinions less than controlling weight. Dr. Nomula's first treatment note of record is from a follow up appointment in April 2013, a year before Plaintiff's alleged onset date. (R. 410) Plaintiff told Dr. Nomula that she was treated in the ER a month earlier after overdosing on Xanax (she had snorted, injected, and orally consumed it) because her cat died. (R. 391) "Since the incident her boyfriend broke with her and her friends left her and [she is] feeling anxious and has been having chest pain and feels heavy in the chest." (R. 410) After confirming Plaintiff was seeing a psychiatrist, Dr. Nomula assessed Plaintiff with headaches and chest discomfort due to anxiety. Next, Plaintiff returned to Dr. Nomula in December 2013, when she "admits that she has been involved with wrong person and had unprotected sex past few weeks and as well used IV drugs like meth about 3 times past 4 to 6 weeks." (R. 413) Dr. Nomula conducted a routine gynecological exam, screened Plaintiff for hepatitis, and advised Plaintiff to stop using drugs.

From this point (December 2013), there is a treatment gap until May 2015, when Plaintiff treated with Dr. Nomula for a boil on her left arm from hot oil splattering on her wrist. (R. 415) In November 2015, Dr. Nomula treated Plaintiff for chronic recurrent sinus issues and a blister on her left foot. (R. 416) Plaintiff's next appointment was a month later (the same day Dr. Nomula completed her RFC assessment) for an acute upper respiratory infection. (R. 440) Dr. Nomula documented Plaintiff medical history of bipolar disorder, "disc disease of LS spine, [and] . . . ADD under psychiatric care." (*Id.*)

After her December 2015 appointment and RFC assessment, Plaintiff treated with Dr. Nomula six more times over two years for relatively minor problems such as sinus congestion in July 2016 (R. 442); a urinary tract infection and a routine gynecological exam in September 2016 (R. 444-45); a sinus infection in March 2017 (R. 447); a rash and sinusitis in June 2017 (R. 448);

and neck and back pain in September 2017 (when Dr. Nomula ordered a cervical spine x-ray and advised Plaintiff to see a physical therapist) (R. 493). Against this backdrop of conservative treatment, the ALJ did not err in discounting Dr. Nomula's opinions; Plaintiff's second argument fails.

### 3. *Medical listing 12.04(A)(2) (depressive, bipolar, and related disorders)*

Next, Plaintiff argues that she meets the requirements of medical listing 12.04(A)(2) pertaining to bipolar disorder. The Commissioner retorts that Plaintiff does not meet all the specified medical criteria. I agree that substantial evidence supports the ALJ's decision that Plaintiff does not meet the listing.

To backtrack, at step three, Plaintiff has the burden of establishing the existence of an impairment or combination of impairments that meets or equals the criteria of a medical listing in 20 C.F.R. pt. 404, Subpt. P, App. 1. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). The purpose of the medical listings is to "streamline the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background." *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004). If a claimant establishes that she meets or equals a listing, no further proof of disability is required. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).

A claimant must meet or equal *all* the requirements of a listing. *Id.* at 530-31. Mere diagnosis of a listed impairment is by itself not enough; the record must contain corroborative medical evidence supported by clinical and laboratory findings. *Carnes*, 936 F.2d at 1218. And if a claimant contends that an impairment equals a listed impairment, the claimant must present evidence that describes how the impairment has such an equivalency. *Wilkinson on Behalf of Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987).

The medical listing Plaintiff focuses on in her appeal is listing 12.04(A)(2) pertaining to bipolar disorder. The ALJ specifically addressed whether Plaintiff's condition satisfied this listing, although in the Eleventh Circuit such consideration can be implicit in an ALJ's finding that a claimant did not have an impairment or combination of impairments that met the requirements of any listed impairment or the equivalence of such. *See Hutchinson v. Bowen*, 787 F.2d 1461,1463 (11th Cir. 1986) (providing that an ALJ need not recite the evidence relied upon in finding that a claimant does not meet a listing because an implicit finding suffices); *Flemming v. Comm'r of Soc. Sec.*, 635 F. App'x 673, 676 (11th Cir. 2015).

Listing 12.04(A)(2) requires a claimant to provide medical documentation of bipolar disorder, characterized by three or more of the following (referred to as the paragraph A criteria): pressured speech; flight of ideas; inflated self-esteem; decreased need for sleep; distractibility; involvement in activities that have a high probability of painful consequences that are not recognized; or increase in goal-directed activity or psychomotor agitation. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(A)(2).

A claimant must also meet the listing's paragraph B or paragraph C criteria. Here, Plaintiff focuses on paragraph B only, which requires an extreme limitation of one, or a marked limitation of two, of the following areas of mental functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(B). A marked limitation means the claimant's ability to function independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation means the claimant is unable to function independently, appropriately, effectively, and on a sustained basis.

The ALJ explicitly considered listing 12.04 as follows: "The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, I have considered whether the "paragraph B" criteria are satisfied." (R. 15) The ALJ then found Plaintiff has a mild limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a mild limitation in her ability to adapt and manage herself. (R. 15-16) So, Plaintiff did not satisfy the paragraph B criteria.

I find the ALJ's consideration of the paragraph B criteria supported by substantial evidence.[2] It is Plaintiff's burden to establish the existence of an impairment that meets or equals a listing. The only medical evidence Plaintiff cites to addressing paragraph B is Dr. Yale's October 2017, mental RFC assessment that found she had marked limitations in the following areas: ability to interact with the public; ability to accept instructions and respond to criticism from supervisors; ability to get along with coworkers; and ability to maintain socially appropriate behavior. (R. 462; doc. 24 at 29) As discussed in the first section of this Order, however, substantial evidence supports the ALJ's decision to discount Dr. Yale's opinions. Plaintiff points to no corroborative medical evidence, supported by clinical and laboratory findings, that she meets paragraph B's criteria.

To be sure, Plaintiff's administrative record reveals a long history of mental health problems. But at this point in my analysis, I must reiterate that, when reviewing an ALJ's decision, my job is to determine whether the administrative record contains enough evidence to support the

---

[2] Because substantial evidence supports the ALJ's finding that Plaintiff does not meet paragraph B's criteria, I need not address whether Plaintiff meets paragraph A's criteria. *See Sullivan v. Zebley*, 493 U.S. at 530-31 (a claimant must meet or equal *all* the requirements of a listing).

14

ALJ's factual findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, ___ U.S. ___; 139 S.Ct. 1148, 1154 (2019). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Id.* In other words, I am not permitted to reweigh the evidence or substitute my own judgment for that of the ALJ even if I find the evidence preponderates against the ALJ's decision. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Considering this, there is substantial evidentiary support for the ALJ's decision that Plaintiff does not meet listing 12.04.

###    4.    *Appointments Clause*

Finally, Plaintiff contends the ALJ was not properly appointed and lacked authority to decide his case. This argument fails. *See generally Lucia v. S.E.C.*, __ U.S. __, 138 S.Ct. 2044 (2018) (holding petitioner raised "timely" challenge to appointment of ALJ who heard his case because he first raised issue during administrative proceedings before SEC); *Sims v. Apfel*, 530 U.S. 103, 108 (2000). As the Commissioner notes, Plaintiff should have raised this complaint earlier. By failing to do so, Plaintiff waived the issue. *See* doc. 24 at 38-47; *see also United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) (holding that parties may not wait until court to raise a statutory "defect in the … appointment" of the official who issued agency's initial decision); *Elgin v. Dep't of Treasury,* 567 U.S. 1, 23 (2012) (plaintiff required to exhaust constitutional claim to administrative agency before seeking review in federal court).

Relying on *Sims v. Apfel,* U.S. 103 (2000), Plaintiff reasons that her Appointments Clause challenge is timely. Another judge in this district recently rejected this argument, and I agree. *See Miaolino v. Comm'r of Soc. Sec*, Case No. 2:18-cv-494-FtM-UAM, 2019 WL 2724020 (M.D. Fla. July 1, 2019). In *Miaolino*, the judge explained that "*Sims* concerned only whether a claimant must present all relevant issues *to the Appeals Council* to preserve them for judicial review; the

15

[Supreme] Court specifically noted that '[w]hether a claimant must exhaust issues before the ALJ is not before us.'" *Id.*, citing *Shaibi v. Berryhill*, 883 F.3d 1102, 1109 (9th Cir. 2017) (quoting *Sims*, 530 U.S. at 107). Because the issue is whether Plaintiff's challenge – presented to this Court for the first time – is timely, *Sims* is inapposite.

The Supreme Court in *Lucia* did not make a blanket finding that all ALJs are subject to the Appointments Clause, just that SEC ALJ**s** are so subject. At the time the Supreme Court decided *Lucia*, the SEC had only five ALJs. *Lucia*, 138 S.Ct. at 2049. In contrast, there are currently over 1,700 Social Security Administration ALJs. *See Miaolino,* 2019 WL 2724020, at *7, citing ALJ Disposition Data for Fiscal Year 2019, *available at* https://www.ssa.gov/appeals/DataSets/03_ALJ_Disposition_Data.html. This is more ALJs than all other federal agencies combined. *See* SSR 19-1p, 84 Fed. Reg. 9582-02 (Mar. 15, 2019). [3] The Social Security Administration annually receives about 2.6 million initial disability claims and completes about 689,500 ALJ hearings; in 2018, it took an average 809 days to process a claim from its initial receipt to an ALJ decision, with more than 850,000 people waiting for ALJ hearings. *See* doc. 24 at 46-47, n. 16, citing SSA's Annual Performance Report, Fiscal Years 2018-2020, at 4, 42, 46 (2019).

"If the courts were to apply *Lucia* to Social Security cases as Plaintiff argues this Court should, millions of cases would need be remanded for rehearing by a different ALJ. Given these important efficiency concerns and the Supreme Court's specific findings in *Lucia*, the Court is

---

[3] On March 15, 2019, the Commissioner published Social Security Ruling 19-1p, Titles II and XVI: Effect of the Decision in *Lucia v. Securities and Exchange Commissioner* (SEC) on Cases Pending at the Appeals Council. 84 Fed. Reg. 9582-02 (Mar. 15, 2019). The ruling explains that when claimants have raised timely Appointments Clause challenges by presenting that claim either to the ALJ or to the Appeals Council, the agency shall provide for additional administrative review of their claims, as required by *Lucia*.

skeptical that *Lucia* is even controlling as to Social Security Administration ALJs." *Miaolino*, at *7. What is more, as the Commissioner points out, most courts faced with this issue have declined to extend *Lucia* so far (*see* doc. 24 at 42-44, collecting cases). This includes my recent Order affirming the ALJ's decision denying benefits in *Heubert v. Commissioner of Social Security*, Case No. 2:18-cv-781-FtM-MAP, 2019 WL 5206065 (M.D. Fla. Oct. 16, 2019).

*D. Conclusion*

For the reasons stated above, it is ORDERED:

(1) The Commissioner's decision is AFFIRMED; and

(2) The Clerk of Court is directed to enter judgment for the Defendant and close the case.

DONE and ORDERED in Tampa, Florida on January 28, 2020.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE